## Case No. 5,262.

### GASS v. STINSON.

[3 Summ. 98.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1837.

EVIDENCE—EXAMINATION BY BOTH PARTIES—TESTIMONY AS TO CONTENTS OF BOOKS — PARTNERSHIP—PAYMENT OF INDIVIDUAL INDEBTEDNESS—RUNNING ACCOUNTS—SET-OFF.

1. The general rule at law is, that no evidence shall be admitted, but what is or might be under the examination of both parties.

[Cited in The Jacob Brandon, 33 Fed. 160.]

2. Semble, a deposition may be admitted in equity, where the direct interrogatories have been fully answered, and death or some inevitable accident occurs, which, without any

---

[3] But see on this point Harrison v. Courtweld. 1 Russ. & M. 428, and Pigott v. Croxall, Id. 428, note.

[1] [Reported by Charles Sumner, Esq.]

fault on either side, prevents a cross-examination.

[Cited in Re Cary, 9 Fed. 756; Celluloid Manuf'g Co. v. Arlington Manuf'g Co., 47 Fed. 5.]

3. Quaere, how this would be at law?

4. The direct examination of a witness was taken by a commissioner, with the consent of both parties. No cross-interrogatories were ever filed; and the witness lived several months after the direct examination was begun; there was no proof, that, if the cross-interrogatories had been filed, they might not have been answered. *Held*, that the omission to file the cross-interrogatories was at the peril of the party, and that the deposition is admissible.

[Cited in Lewis v. Eagle Ins. Co., 10 Gray, 510.]

5. A witness, whose books are out of his reach, so that he cannot have access to them, may testify to their contents.

6. Quaere, if the payments and credits made by one partner after a dissolution of the partnership, and joint agency, and after a new individual agency in him, can be applied to the extinguishment of a debt of the partnership, unless circumstances justify the presumption, that the partnership debt has been adopted as his individual debt.

[Cited in Smith v. United States, 2 Wall. (69 U. S.) 236.]

7. The natural presumption is that a partner paying a sum of money to his private creditor, who is also a creditor of the partnership, means to pay it on his private account, unless circumstances vary this presumption.

[Cited in Perot v. Cooper, 17 Colo. 80, 28 Pac. 394.]

8. The doctrines of the common law as to the appropriations of indefinite payments generally, have been borrowed from the Roman law.

9. Semble, that the creditor cannot elect to what debt to apply an indefinite payment, except where it is utterly indifferent to the debtor to which it is applied.

[Cited in Whetmore v. Murdock, Case No. 17,510.]

10. In the case of running accounts between parties, with various items of debit and credit on both sides, occurring at different times, each item of payment or credit, is to be applied, in the absence of any special appropriation, in extinguishment of the earliest items of the debt, then actually due, and constituting debitum in praesenti.

[Cited in the Antarctic, Case No. 479.]

11. In cases of mutual running accounts, every item, whether for pay, services, or otherwise, ending in a debt, is to be deemed a credit in favor of the party pro tanto.

12. *Held*, that the master was right in allowing a sum for labor, wharfage, &c., as a credit in an account.

13. Courts of equity, in cases of set-off, follow the law.

[Cited in McKenzie v. Nevins, 22 Me. 141; Caldwell v. Wentworth, 14 N. H. 439; Inhabitants of Farmington v. Stanley, 60 Me. 474. Disapproved in Gaston v. Barney, 11 Ohio St. 512.]

[This was a bill in equity by Joseph Gass against Abner P. Stinson, for an injunction to stay proceedings, and for other relief. See Cases Nos. 5,260 and 5,261.]

At this term the master made his report, as follows: "The state of accounts between the defendant as warden of the state prison in New Hampshire, and Noah James, as his agent, constituted January 27, 1831, for the sale of stone consigned to him, as they existed April 30, 1832, appears in a schedule marked 'A,' which accompanies this report, and is signed by the master. (This is omitted here.) In this account said James is charged with all the stone belonging to the prison, and in his hands, on the 27th January, 1831, and with all the stone consigned to him as agent, down to April 30, 1832; and with a lot of hoops for the same; rejecting all stone received for the 'New Orleans contract,' so called. He is credited with the value or amount of stone remaining in his hands, unsold, on the 30th day of April, 1832, being parcel of what had been previously debited to him as above. He is also credited with all moneys by him paid to the warden of the prison, or on his account, not specially appropriated to any other than general account. Also, with his commissions on sales of the stone consigned to him; and for his wharfage and extra services in regard to other stone sent to him for shipment to other agents or places; all which appear in the account herewith. The plaintiff Gass being desirous of the testimony of said Noah James, who was then dangerously ill, a commissioner was agreed on by the parties, on November 22, 1836, to take his answers to interrogatories; and his answers were accordingly taken to the interrogatories filed by the plaintiff, no objection being made to the commissioner's proceeding immediately, upon those interrogatories alone, till others could be filed, saving to the defendant all other benefit of exception. The witness lived several months afterwards, during which the commissioner proceeded with the examination, as the witness was able to bear it; but before the filing of any cross-interrogatories, and after answering, under oath, to all the direct interrogatories, the witness died. The defendant objected to the admission of these answers, for the want of cross-examination; but I admitted the testimony. A further objection was made to the answers of James, so far as he testified to matters contained in his books of account, to which books he said he could not have access, they being in some place in the state of New York, not precisely known to him. The defendant insisted that it was the plaintiff's duty to produce these books, they having been produced in court, upon notice, at the trial of the action of Stinson v. James [unreported], and no leave of the court having been given to take them away. It was answered by the plaintiff's counsel, and not denied by the other side, that the books of both parties were taken away, by mutual tacit consent, and for their private and necessary occasions; and that he had used every means in his power to obtain these books, but without success. I therefore overruled

this objection. Testimony was offered by the defendant, to the point that some kinds of the stone ought to be charged at higher prices than were allowed by the auditor, in his report in the above-mentioned action at law. To this the plaintiff objected, contending that said report was conclusive, between these parties, both as to debits and credits. I received the evidence, but taking all the testimony together, I have allowed only the prices stated in the auditor's former report. The defendant produced a paper purporting to be a statement of accounts between him as warden of the New Hampshire state prison, and Stone and James, his former agents, showing a large balance due to the prison; and insisted that the general payments made by James should first be applied to the balance of this old account; in proof of which he offered the prison books, and the deposition of G. C. Thompson. But taking into consideration the fact that a quantity of stone alleged to form part of this balance had already been receipted for by said James under his last agency; that no such claim was set up at the hearings before me as auditor in the former suit; that the correspondence of the parties exhibited to me, subsequent to the termination of the agency of Stone and James discloses no such claim; and that said James positively swears that nothing was due to the prison; I was not satisfied of the validity of that demand; and therefore did not perceive any necessity for deciding the question of such application of the payments. The defendant's counsel also objected to the allowance, in this account, of any wharfage, or any personal services of said James, rendered after April 30, 1832. But I thought otherwise; and have credited said James for all such services and wharfage, down to the close of his agency in 1833; but distinguishing the amount accruing prior to the 30th April, 1832, from that which subsequently accrued. Charging said James with the stone aforesaid, and allowing him against such debits all payments made on general account, and all labor and services rendered, there was nothing due from him to the state prison of New Hampshire, as its agent for the sale of stone, on the 30th day of April, 1832; but a balance was in his favor of a thousand and forty-four dollars and eighteen cents. The further payments made by said James on the same general account, down to October 4, 1833, being added to the balance aforesaid, amount to three thousand three hundred and forty-two dollars and seventy-four cents. Whether against this sum the said James should be charged with any thing received on general account subsequent to April 30, 1832, or should be recharged with the sum of seventeen hundred and fifty dollars, being the amount credited to him April 30, 1832, for stone then on hand, which, it was proved to me, he sold afterwards, and before October 4, 1833, I have not determined. Which is respectfully submitted. **Simon Greenleaf, Master in Chancery."**

"November 22, 1837. At the request of defendant's counsel, I further certify, that, when a commissioner was agreed on to take the testimony of Mr. James, defendant's counsel called for the production of James' books of accounts, in order to enable him to frame proper cross-interrogatories. The plaintiff's counsel said that the books were as much in defendant's power as in plaintiff's, being the private books of a third person; but that he deemed them important evidence for the plaintiff, and should use all means in his power to obtain intelligence of them, and if he knew the place, he would send specially for them, rather than not have the use of them; but he denied that the plaintiff was bound to produce them. **S. Greenleaf, Master in Chancery."**

The defendant filed his exceptions to the report, as follows: "1st exception. For that the said Greenleaf, acting as master in chancery, in and by his report, certified, that he, the said master, permitted the deposition of Noah James to be read in evidence before him, which deposition had been taken on the interrogatories of the plaintiff only; whereas the cause should not have been, so read, because the said Stinson had no opportunity to cross-examine said James. 2d. Because said deposition was so read in evidence, although said James testified to the contents or matters contained in his books of account, without their being then seen or made a part of his deposition; whereas, the same should have been rejected, because the said books were not then produced; and because the said books which had been produced in the suit of said Stinson against said James and Gass, upon notice, had been withdrawn and taken out of the state of Massachusetts, without the knowledge or consent of said Stinson, and he was thereby deprived of an opportunity of examining the entries therein, and cross-examining said James thereto; notwithstanding it had been agreed that all evidence used in said suit at law, should be used in this case, as appears by an entry on the docket of the court. 3d. Because the said master did not allow or proceed to examine into the state of the balance due from said James on the termination of a former agency, and apply first the subsequent payments in extinguishment thereof, or at least proportionably with the other accounts due; whereas the said Stinson alleged that there was a considerable balance due from said James on such prior account, and sufficient proof to establish the cause was offered and in evidence in the depositions of said cause and otherwise; whereas such allowance should have been had, and subsequent payments first applied to the extinguishment thereof. 4th. Because the said master did not apply or pass credits in the account by him taken to the payment of stone previously delivered for the

New Orleans job by said Stinson, or for stone delivered for said job proportionably with other charges for stone not delivered or shipped for that particular job; whereas, such application should have been made either in whole or in part,—or at most only a portion-rate credited in said account taken by him up to the 30th of April of the year 1832, where there was no direct evidence of a particular application by the parties. 5th. Because said master allowed items for labor, wharfage, and services, &c., of said James, which were never made or received in payment, to be applied to the credit of said James, charged and stated in said account by him taken; whereas, they should not have been so allowed or applied."

Mr. Aylwin, in support of the exceptions. B. Rand, contra.

STORY, Circuit Justice. The first exception is to the admissibility of the deposition of Noah James in the case, he having died before any cross-interogatories were propounded to or answered by him. The general rule at law seems to be, that no evidence shall be admitted, but what is or might be under the examination of both parties. So the doctrine was laid down by Lord Ellenborough in Cazenove v. Vaughan, 1 Maule & S. 4. 6, and his lordship on that occasion added, "And it is agreeable to common sense, that what is imperfect, and, if I may so say, but half an examination, shall not be used in the same way as if it were complete. The same principle seems recognized in Attorney General v. Davison, 1 McClel. & Y. 160. See, also, 1 Starkie, Ev. (2d Ed.) 265; Id. 270, 271. But neither of these cases called for an explicit declaration as to what would be the effect of a regular, direct examination, where the party had died before any cross-examination. In —— v. Brown, Hardr. 315, in the case of an ejectment at law, the question occurred, whether the examination of a witness, taken de bene esse to preserve his testimony upon a bill preferred and before answer, upon an order of court, where the witness died before he could be examined again, and he being sick all the meantime, so that he could not go to be examined, was admissible on the trial of the ejectment; and it was ruled, after consultation with all the judges, that it could not be, "because it was taken before issue joined in the cause; and he might have been examined after." From what is said in the same book in Watt's Case, Hardr. 332, it seems to have been held, at that time, that, if witnesses are examined de bene esse before answer upon a contempt, such depositions cannot be made use of in any other court but the court only where they were taken. And the reason assigned is, "because there was no issue joined, so as there could be a legal examination." It may well be doubted, if this doctrine would prevail in our day, at least in courts of equity. See, on this point, 1 Starkie, Ev. (2d Ed.) 271, and

note o, note q; Id. 272, notes x and y. Indeed, it seems directly against the decision of the court of king's bench in Cazenove v. Vaughan, 1 Maule & S. 4, 6; for in that case it was ruled, that a deposition taken de bene esse, where the party might have cross-examined, and did not do so, or take any step to obtain a cross-examination, might be read in a trial at law, the witness having gone abroad. On that occasion, the court said; "If the adverse party has had liberty to cross-examine, and has not chosen to exercise it, the case is then the same as if he had cross-examined; otherwise, the admissibility of the evidence would depend upon his pleasure, whether he will cross-examine or not, which would be a most uncertain and unjust rule." But it is the more important to consider how this matter stands in equity; for, although the rules of evidence are, in general, the same in equity as at law, they are far from being universally so.

It seems clear, that, in equity, a deposition is not, of course, inadmissible in evidence, even if there has been no cross-examination, and no waiver of the right. Thus, if a witness, after being examined on the direct interrogatories, should refuse to answer the cross-interrogatories, the party producing the witness will not be deprived of the benefit of his direct testimony; for, upon application to the court, the witness would have been compelled to answer. So it was held in Courtnay v. Hoskins, 2 Russ. 253. But if the witness should secrete himself, to avoid a cross-examination, there the court would, or at least might, suppress the direct examination. Flowerday v. Collet, 1 Dickens, 288. In such a case a cross-examination is still possible; and the very conduct of the witness, in secreting himself, has a just tendency to render his direct examination suspicious. But where the direct interrogatories have been fully answered, and an inevitable accident occurs, which, without any fault on either side, prevents a cross-examination, I do not know that a like rule has been established, or that the deposition has been suppressed. So far as authorities go, they incline the other way. In Arundel v. Arundel, 1 Ch. R. 90, the very case occurred. A witness was examined for the plaintiff. and was to be cross-examined for the defendant; but before he could be cross-examined he died. Yet the court ordered his deposition to stand. Copeland v. Stanton, 1 P. Wms. 414, is not an adverse authority; for, in that case, the direct examination was not completed, and the witness had not signed the deposition, so far as it went; and the examination being postponed to another day, he was the next morning taken suddenly ill, and died. The court denied the motion to allow the deposition, as far as it had been taken. But the court refused, because the examination was imperfect; and, indeed, until the witness had signed the examination, he was at liberty to amend and alter it in any part. In

·O'Callaghan v. Murphy, 2 Schoales & L. 158, Lord Redesdale allowed the deposition of a witness, whose examination had been completed, but who died before his cross-examination could be had, to be read at the hearing, deeming it proper evidence, like the case of a witness at nisi prius, who, after his examination, and before his cross-examination, should suddenly die, under which circumstances, he thought, that the party producing him would not lose the benefit of the evidence he had already given. But the want of such cross-examination ought to abate the force of the testimony. However, the point was not positively and finally ruled, as, upon examining the cross-interrogatories, they were not found to apply to any thing, to which the witness had testified' in his direct examination, and, therefore, the deposition was held admissible. In Nolan v. Shannon, 1 Moll. 157, the lord chancellor held, that the direct examination of a witness might be read at the hearing, where a cross-examination had been prevented by his illness and death. My own researches, and those of the counsel, have not enabled me to find any other cases, in which the question has been raised; and in the latest book of practice, 1 Smith, Ch. Pr. 294, no other case is alluded to on the subject, than that of ·Copeland v. Stanton, 1 P. Wms. 414. So that the general doctrine is far from being established in the manner, which the argument for the defendant has supposed, and appears strongly to lead the other way.

But if it were, I should have no doubt, that the special circumstances of this case would well create an exception. The direct examination was taken by consent. No cross-interrogatories were ever filed. The witness lived several months after the original examination was begun; and there is not the slightest proof, that, if the cross-interrogatories had been filed, they might not have been answered. Under such circumstances, I am of opinion, that the omission to file the cross-interrogatories was at the peril of the defendant. I do not say, that he was guilty of laches. But I put it upon this, that, as his own delay was voluntary, and the illness of the witness well known, the other party is not to be prejudiced by his delay. His conduct either amounted to a waiver of any objection of this sort, or to an election to take upon himself the whole hazard of the chances of life. It appears to me, that the case falls completely within the principles laid down in Cazenove v. Vaughan, 1 Maule & S. 4, 6.

The second exception is to the inadmissibility of James' testimony to the contents of his books of account. But those books were not in the witness's possession, and were beyond his reach, and that of the court. They had been formerly in the cause; but had been withdrawn from the custody of the court, by the tacit consent of both parties. Under such circumstances, it seems to me that the master was right in admitting the testimony. The case is not essentially different from what it would be, if the books had been mislaid, or lost; for no access could be had to them by the parties, or by the witness; and, therefore, secondary evidence of their contents was admissible.

The third exception is to the disallowance by the master of the supposed balance of a former old account, asserted to be due from James and one Stone, as agents under the defendant, Stinson, in the state prison business, at a prior period, and his refusal to apply any of the payments and credits of James to the liquidation of that balance. The reasons given by the master for this disallowance and refusal seem to me to be entirely satisfactory. He had been auditor between the same parties in the suit at law (still pending in this court), upon the same matters, in regard to which the present bill is brought, and it was agreed by the parties, that his report, rendered in that case, should be deemed evidence before him, upon the hearing of the present cause. The master now says, that he is not satisfied, that the present claim, for such balance of the old account is well founded; and he has stated very strong reasons for entertaining a presumption against it, which reasons are not in the slightest manner affected by any rebutting proofs before the court. Under such circumstances, the report is entitled to be treated as importing entire verity, as to the matter of fact of the invalidity of the claim. I would add, that I exceedingly doubt, whether, in a case of this sort, the payments and credits made by one partner, after a dissolution of the partnership and joint agency, and after a new individual agency in him, can be rightfully applied to the extinguishment of a debt of the partnership, unless the attendant circumstances justify a presumption, that the debt of the partnership has been adopted as his individual debt, and brought into account as such, or the payments and credits were intended by the parties to be so actually applied. No evidence of this sort exists in this case. The natural presumption is, that a partner, paying a sum of money to his private creditor, who is also a creditor of the partnership, means to pay it on his own private account, unless some circumstances occur, which repel or qualify that presumption. No case has been cited, in which a different doctrine has been asserted and acted on; and certainly my own researches have not enabled me to find any. The case of Baker v. Stackpoole, 9 Cow. 420, 436, so far as it goes, is rather the other way.

But I wish to add a few words upon the subject of the appropriation of payments, because I cannot concur in some of the views, which have been suggested in the argument; and because they will serve more fully to explain the ground of the doctrine of indefinite payments in relation to cases

of running accounts, hereinafter stated. There is no doubt that the doctrine of the common law, as to the appropriation of indefinite payments, has generally been borrowed from the Roman law; and it is deeply to be regretted that there has been any departure in any of the authorities from its true results. The Roman law is equally simple, convenient, and reasonable upon this subject; and, for most cases, will furnish an easy and satisfactory solution. Sir William Grant, in Clayton's Case (Devaynes v. Noble, 1 Mer. 604), has stated the general doctrine of the Roman law in an accurate manner. "The leading rule," says he, "with regard to the option given, in the first place to the debtor, and to the creditor in the second, we have taken literally from thence. But, according to that law, the election was to be made at the time of payment, as well in the case of the creditor, as in that of the debtor, 'In re praesenti, hoc est, statim, atque solutum est:—caeterum, postea non permittitur.' If neither applied the payment, the law made the appropriation according to certain rules of presumption, depending on the nature of the debts, or the priority in which they were incurred. And, as it was the actual intention of the debtor that would, in the first instance, have governed, so it was his presumable intention that was first resorted to as the rule by which the application was to be determined. In the absence therefore, of any express declaration by either, the inquiry was, what application would be most beneficial to the debtor. The payment was, consequently, applied to the most burdensome debt,—to one that carried interest, rather than to that which carried none,—to one secured by a penalty, rather than to that which rested on a simple stipulation;—and, if the debts were equal, then to that which had been first contracted. 'In his, quae praesenti die debentur, constat, quotiens indistinctè, quid solvitur, in graviorem causam videri solutum. Si autem nulla praegravet,—id est, si omnia nomina similia fuerint,—in antiquiorem.'"[2] Pothier, in his edition of the Pandects, has collected together all the texts of the Roman law on this subject (Poth. Pand. lib. 46, tit. 3, art. 1, notes 89–99): and he has summed up the general results in his treatise on Obligations (Poth. Obl. notes 528–536).

Now, the whole of this doctrine of the Roman law turns upon the intention of the debtor, either express, implied, or presumed; express, when he has directed the application of the payment, as in all cases he had a right to do; implied, when he knowingly has allowed the creditor to make a particular application at the time of the payment without objection; presumed, when, in the absence of any such special appropriation, it is most for his benefit to apply it to a particular debt. And, notwithstanding there are contradictory and conflicting authorities on this subject in the English and American courts, I cannot but think, that the doctrine of the Roman law is, or, at least, ought to be held, and may well be held, to be the true doctrine to govern in our courts. There is a great weight of common law authority in its favor; and, in the conflict of judicial opinion, that rule may fairly be adopted, which is most rational, convenient, and consonant to the presumed intention of the parties. If the creditor has a right in any case to elect to what debt to appropriate an indefinite payment, it seems to me, that can be only, when it is utterly indifferent to the debtor, to which it is applied, and then, perhaps, his consent, that the creditor may apply it, as he pleases, may fairly be presumed. Mr. Justice Cowen, in his learned and elaborate opinion, in Pattison v. Hull, 9 Cow. 747; Id. 765–773, has examined and criticised all the leading authorities; and manifestly leans in favor of adopting the doctrines of the Roman law throughout. I confess myself strongly inclined the same way; and shall yield only to authorities which I am bound to follow.

The fourth exception is, as to the mode in which the payments, made by James, have been appropriated by the master. In the case of a running account between parties, where there are various items of debit on one side, and various items of credit on the other, occurring at different times, and no special appropriation of payments, constituting the credits, has been made by either party, the successive payments and credits are to be applied in discharge of the items of debit, antecedently due, in the order of time in which they stand in the account. In other words, each item of payment or credit is applied in extinguishment of the earliest items of debt, until it is exhausted. This was the rule laid down in Clayton's Case, 1 Mer. 572, 604, 608; and it was recognized and acted upon by the supreme court of the United States in U. S. v. Kirkpatrick, 9 Wheat. [22 U. S.] 720, 737, 738; and by this court in U. S. v. Wardwell [Case No. 16,640]. In McDowell v. Blackstone Canal Co. [Id. 8,777], the doctrine was limited to debts antecedently due, and not applied to debts which were not due at the time of the payments or credits. This qualification is indispensable to the good sense of the rule, which is founded upon the apparent intentions of the parties; for it would be almost absurd to suppose that a man, owing to his creditor two debts, one of which was due and the other not, should be presumed to intend to apply payments made to his creditor in discharge of the debt not yet due, rather than to the debt actually due. See the cases in the same point referred to in Pattison v. Hull, 9 Cow. 765, 773, 777, and note. Now, upon the ground of these prin-

[2] The doctrine of the Roman law is still more fully shown and compared with the common law decisions in a very able note to the case of Pattison v. Hull, 9 Cow. 773–777, to which I gladly refer.

ciples, it is plain that unless some moneys were due and unpaid for stone supplied in fulfilment of the New Orleans contract, before the 30th of April, 1832, there is no room for the application of any prior payments to any other than the agency account. In this view of the matter, the master's report would be perfectly unexceptionable. Now, I have been unable to find, in any of the evidence, any positive or clear proofs, that, up to the 30th of April, 1832, there was a single cent due from James, on account of stone supplied under the New Orleans contract—a contract, which it is not unimportant to add, was not a contract originally made by Stinson alone, but by Stinson, and Hastings, his partner. Some deliveries of stone, on account of the New Orleans contract, were made before the 30th of April, 1832; but it does not appear how much. They were continued for a considerable length of time after the 30th of April, 1832, and the job itself was not completed until a subsequent period; and (as it is said) after very injurious delays. Now, it is no where questioned, that Stinson did undertake to supply all the stone, of the proper dimensions, to complete the New Orleans job. And in contracts of this sort, it is a natural presumption, at least in the absence of all rebutting circumstances, that the right to payment depends upon a due fulfilment of the whole contract. If this be so—and there is not a scintilla of evidence to dispel the presumption—then the court is bound to act upon it, and to treat these deliveries for the New Orleans contract as only in fulfilment of an executory contract, upon which no sums were finally due. In the evidence (which, however, under the form of the report, is not properly before the court), which has been alluded to at the argument, it appears, that the first charge in the books of account for the New Orleans contract is debited on the 31st of May, 1832, and the last on the 13th of July, of the same year, making an aggregate to upwards of $5,030. So that upon the face of the accounts, it would seem, that the charges were not understood to be proper debits in account, until the respective times above stated. An explanation, however, is made in the testimony of the defendant's witness (Mr. Wild), who was superintendent of the stone-shop under Stinson, and who stated that his practice was first to enter in his own memorandum-book the number of the stone and the dimensions; and, when the stone was sent off from the shop, he then affixed the date when it was so sent. He added, "It was my uniform practice to charge in the day-book the amount of stone for a particular job or contract, when it was finished and delivered, and not before, unless on the last day of May, when it was necessary to bring up the books, for the warden to make his annual report, when I charged in the day-book what had then been delivered of any unfinished job or contract." It seems to me, that this statement completely establishes what the facts were in regard to the New Orleans contract; that is to say, that payments were not expected to be made, or debits deemed due thereon, until the whole job was finished. If this be true, then the New Orleans job cannot be admitted to form an item of the account, to which the prior payments and credits were to be applied. But it is not necessary in this case to resort to general presumptions. The onus probandi is on the defendant to establish a subsisting debt, due in praesenti, and not in futuro,—and much more, one not contingent,—in order to bring the case within the reach of the principles as to the appropriation of payments and credits. If he fails in his proof, that is sufficient to apply the payments and credits to other known or admitted debts.

The fifth and last exception is, as to the allowance by the master of a sum for labor, wharfage, and services to James, as a credit in the account. The ground of objection to the allowance of this item seems to be, that it is properly matter of set-off, and not of credit in account. But it seems to me, that where there are mutual running accounts between the parties in a case of this sort, there is a necessary understanding between the parties, that every item of account on either side, ending in a debt, is to be deemed a credit in favor of the party pro tanto upon the final adjustment of the accounts. Every service performed by a factor or agent respecting the business of his principal entrusted to his charge, and every expenditure by him about the same constitutes a proper debit on his side, to be deducted from the amount of the debt due by him to his principal. In the present case, this doctrine is the less important to be considered, for the item objected to seems to amount, up to the 30th of April, 1832, to the sum of $125.83 only, whereas the balance then due by Stinson to James is found to be $1,044.18. Whether allowed or not cannot make the slightest difference in the present case. Besides, it seemed to be admitted at the argument, that this constituted a proper item of set-off to an action at law brought to recover the balance due on the account of Stinson against James, under the Massachusetts statutes of set-off. If so, then it is properly allowable in equity; for courts of equity in such cases follow the analogy of the law.

Upon the whole, the exceptions must be overruled, and the report be confirmed, so far as it applies to the accounts up to the 30th of April, 1832.