Estate of William L. Belknap, deceased, William L. Belknap, 3rd, and Anna Berggren Anderson, executors et al. [1] v. Commissioner. Estate of William L. Belknap v. Commissioner
Docket Nos. 23842, 23843, 23844, 23845.
United States Tax Court
1951 Tax Ct. Memo LEXIS 134; 10 T.C.M. (CCH) 769; T.C.M. (RIA) 51243; August 20, 1951
Stanley Worth, Esq., 404 Transportation Bldg., Washington 6, D.C., for the petitioners. Paul Lipton, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined an estate tax deficiency against the Estate of William L. Belknap, and transferee liability against three successors to said estate as follows: Docket
No.
Petitioner
Determination
23842
Estate of William L. Bel-
knap
$82,738.78
23843
William L. Belknap, 3rd,
Transferee
33,992.93
23844
Clara Estelle Treat, Trans-
feree
38,849.06
23845
Barbara B. Grimes, Trans-
feree
33,992.93
The primary questions presented are: (1) Whether transfers by decedent of stock of The Belknap Manufacturing *135 Company and his contribution to the capital of that Company of two notes said Company owed him, all occurring in April 1938, are includible in his gross estate under section 811(c) of the Internal Revenue Code; and (2) if so, whether a 25 per cent addition to the tax applies for delinquent filing of the estate tax return. A subsidiary issue is whether testimony of one of respondent's witnesses, subject to incomplete cross-examination by reason of illness of the witness, should be stricken. It is agreed that transferee liability exists if respondent's determination of deficiency is sustained in any amount. Findings of Fact The stipulated facts are hereby found. Decedent, William L. Belknap, Sr., died testate June 7, 1944, at the age of 79, a resident of Stratford, Connecticut. His will was admitted to probate by the Probate Court of Stratford, Connecticut, on July 10, 1944. William L. Belknap, 3rd, and Anna Anderson qualified as executors thereunder on July 20, 1944. The estate tax return was filed with the collector for the district of Connecticut. Decedent was survived by one son, George J. Belknap, a daughter, Clara Estelle Treat, and the following *136 grandchildren: Russell L. Treat and Shirley R. Treat, children of Clara Estelle Treat; William L. Belknap, 3rd, and Barbara B. Grimes, children of a deceased son, W. L. Belknap, Jr.; and Robert L. Belknap and Martha B. Belknap, children of George J. Belknap. The children and grandchildren listed above are descendants of the decedent and his first wife, Clara M. Belknap. The latter were divorced in November 1924. Clara died October 7, 1936. Decedent remarried December 19, 1924. His second wife, Eva B. Belknap, survived him and is still alive. Decedent's son, William L. Belknap, Jr., died in November 1927, survived by his wife, Pauline, who is still living. Decedent often stated that he had made a serious mistake when he divorced his first wife, Clara, and married his second wife, Eva. It was generally known that he and Eva were not happily married. Affected employees at the Company had been instructed that they never should disclose or discuss any of the Company's affairs with Eva, nor make any mention of decedent's personal matters, including financial, to Eva. His banking address was in care of the Company. Decedent was reared in a spiritualist family and personally embraced *137 Christian Science teachings some years before his death. He became particularly interested in these tenets after a trip to the West Coast in 1914 which he had taken for considerations of health. On returning he mentioned the subject to his grandniece, Marcia Heidenreich, with whom later he often discussed Science teachings. Decedent was imperious and jovial. He was given to talkativeness and enjoyed the approbation of others. He was fond of expensive clothing and jewelry. Though bothered with frequent attacks of indigestion, from which he suffered beginning some ten years before his death, decedent was an enthusiastic eater. He customarily took hot water, lemon juice, and bicarbonate of soda to alleviate this condition. As early as 1938 decedent was aware also of an ailment of his gall bladder. In addition, decedent had for many years an epigastric hernia which would bulge, when strained, to a lump about the size of two clenched fists. Decedent often spoke of death and frequently stated that he was getting his house in order to meet his Maker. In September 1935 decedent suffered a bad fall through a hole in the floor of his summer place. Bruises, abrasions, and a strained lower *138 back resulted, following which he developed erysipelas. At the time of the erysipelas he was feverish and there were periods of delirium. He was in bed under his doctor's care for about two weeks and confined to home some time thereafter. Decedent became associated with The Belknap Manufacturing Company, sometimes herein referred to as the Company, prior to 1906. This company, organized under the laws of Connecticut in 1875, has for many years been engaged in Bridgeport, Connecticut, in the manufacture and sale of bronze valves, globes, angles, check valves, and bronze specialties to customers' specifications. Both sons were also associated with the Company. William, Jr., from 1914 until his death in 1927, and George, from an early age until an illness in 1938. Decedent's interests in the Company and his talents were directed toward factory work. William Belknap, Jr., sometimes hereafter called Junior, for some years prior to his death had served as general manager and in that capacity handled the sales and finances of the business. Decedent leaned heavily on Junior's talents. His sudden death in 1927 at the age of 44 was a shock from which decedent never fully recovered. He *139 and Junior had been very close; with only 18 years' difference in their ages, they were more like brothers. Decedent's second son, George, was a good mechanic whose specialty was the manufacturing end of the business. Decedent had a very affectionate feeling toward him. In 1932, after completing his education, William Belknap, 3rd, joined the employ of the Company. At that time decedent was president of the Company, George was vice-president in charge of manufacturing, and Clifford Mason was secretary and treasurer. Mason, a brother-in-law of William, Jr.'s, widow, was relied on for management of the business. As of March 27, 1928, decedent owned or had at his disposal 1,200 shares of Company stock. By successive instruments beginning on that date and concluded by an agreement dated September 22, 1937, decedent created and then revoked three separate trusts embracing such stock. In each he had reserved the right to vote the stock and to receive the income therefrom during his life. The remainder interests in each instance were granted to either or both his surviving children, to Pauline Belknap, and to their respective heirs. On October 29, 1933, and February 5, 1934, decedent *140 created revocable trusts, each of which covered a note in the respective principal amounts of $50,000 and $22,500. These notes had been executed previously by The Belknap Manufacturing Company payable to decedent. In either trust decedent reserved the right to all payments of interest or principal for his life. On his death the trustee of the $50,000 note was directed to demand of the Company $2,500 per year and pay the same in monthly instalments to decedent's first wife, Clara Belknap, for her life. Upon her death the note was to be delivered to the Company and discharged. The trust instrument covering the $22,500 note provided that upon his death the note "be cancelled and delivered up" to the Company and "form no part of the estate of William L. Belknap." Decedent's first wife died in October 1936. Thereafter, on November 19, 1936, decedent directed his attorney, Lorin W. Willis, to revoke the trust dated October 29, 1933, covering the $50,000 note as the purpose for which it was created had ceased. Willis was then directed to draw a new agreement, incorporating the $50,000 note, to be worded like the trust instrument dated February 5, 1934, covering the $22,500 note. On November 24, 1936, the *141 trusts embracing the $50,000 and the $22,500 notes were revoked, and on the same day a new trust agreement covering the $50,000 note was executed. Less than a year later, on September 22, 1937, (the same date noted above on which the last trust covering the 1,800 shares of Company stock was terminated), the November 24, 1936, trust agreement incorporating the $50,000 note was likewise revoked. In the summer of 1937 an attorney, George A. Saden, was retained by decedent for advice in connection with certain proposed personal and Company activity. Decedent discussed with Saden his family affairs and proposals for transferring his major interest in the Company to his children and grandchildren and for transferring to the Company the two notes it owed him totaling $72,500. It was contemplated that as a consequence of his nearly complete divestment of Company interest decedent would be employed by the Company in an advisory capacity at a fair salary. At the conclusion of the discussions which had covered several months, and according to decedent's wishes, Saden outlined sometime prior to the end of 1937 a detailed plan for the chronological execution, beginning January 3, 1938, and *142 continuing through January 8, 1938, of eight proposed documents. In February 1938, however, prior to execution of any of these proposed documents a certified public accountant who specialized in tax matters was consulted for an opinion as to the effect of the proposed transfers with relation to tax liability. The plan submitted to the specialist embraced gifts of stock to only three donees, decedent's two children and Pauline Belknap. After learning that decedent intended that these shares should eventually go to his descendants, it was suggested that the grandchildren be included in order to take advantage of the added gift tax exclusions available for each additional donee. In addition, the plan initially contemplated provided that decedent was to exchange the two notes the Company owed him, totaling $72,500, plus some other items owed to him by the Company approximating $11,000, for an agreement by which the Company would pay decedent an annuity of $12,000 per year for life. The specialist suggested that this proposal be dropped, reasoning that the annuity payments were not an allowable income tax deduction, and suggested instead that decedent contribute the notes to the capital *143 of the Company in exchange for its agreement to pay him a salary, the payments of which would be deductible by the Company for income tax purposes. Further reason for the suggestion of this latter alternative was that the notes had been willed to the Company and decedent did not expect to collect them. However, the contribution to capital was in furtherance of decedent's plan to divest himself of his interest in the Company. By this means the specialist predicted an eventual inheritance tax saving of about $9,500. On April 1, 1938, the Company's outstanding stock, all common, consisted of 1,800 shares of $100 par value each, owned as follows: Decedent
1,199
W. L. Belknap, 3rd
1
George J. Belknap
1
Pauline W. Belknap
479
Clifford L. Mason
120
In execution of the amended plan decedent on April 4, 1938, by an appropriate instrument, contributed the two notes for $50,000 and $22,500, respectively, to the capital of the Company. On April 9, 1938, all Company stockholders and the Company by mutual agreement and in consideration of the payment of one dollar, executed a "Monthly Stipend Agreement," obligating the Company to pay Eva Belknap $100 per month for *144 life, providing that Pauline Belknap, or if she should predecease Eva, William Belknap, 3rd, should see fit in their discretion to deposit a written statement with the Company setting the date when payment should commence. On April 14, 1938, a previously executed stock transfer covenant was amended by a special waiver agreement in order to allow unimpeded execution of decedent's plan. On April 15, 1938, decedent made direct transfers of his Company stock as follows: Pauline W. Belknap
49 shares
W. L. Belknap, 3rd
175 shares
Barbara B. Grimes
175 shares
Six days later, on April 21, 1938, an employment agreement was executed by decedent, the other stockholders, and the Company. It provided, inter alia: "1. That the Corporation does hereby employ the First Party [decedent] as a general advisor and consultant in its business for a term of one (1) year from the 15th day of May, 1938, to and including the 15th day of May, 1939, at a salary of Ten Thousand ($10,000) Dollars per annum payable at the rate of Four Hundred Sixteen Dollars and Sixty-six Cents ($416.66) semi-monthly on the 15th and last day of each month. "2. That the First Party shall render the following *145 services to the Corporation: whenever any question or questions of business, engineering, or mechanical policy are presented to him by the Corporation, he shall offer to the Corporation within a reasonable period of time his best opinion and advice with relation thereto. "3. That the employment contracted for under this agreement shall not require the First Party to report to or be present at the place of business of the Corporation during any specific days of the week nor during any particular hours of the day. The First Party shall, however, always be reasonably available to the Corporation through the various means of communication customarily employed by the business world today, e.g., among others, telephone, mail, telegraph, wireless, cable, etc. The First Party may, however, if he so desires, report to and be present at the place of business of the Corporation at such time or times as he chooses. "4. That the First Party shall have the option to renew this contract of employment with the Corporation for a period of one (1) year provided he shall notify the Corporation in writing not later than eleven (11) months from the date of this contract. Such renewal contract shall *146 in turn be subject to further renewal for one year at the option of the First Party provided he shall notify the Corporation in writing not later than eleven (11) months from the renewal date of said renewal contract; and thereafter each renewal contract, including said further renewal contract shall be subject to successive renewals each year at the option of the First Party in like manner, mutatis mutandis, as provided for the renewal of the instant contract." The contract was renewed at decedent's option each successive year and was in effect at his death. Subsequently, on April 29, 1938, by an agreement of guarantee the employment contract which had previously bound only the Company was made a joint and several obligation of the individual parties. On April 27, 1938, decedent executed five irrevocable trust agreements covering a total of 599 shares of his Company stock, and on that same date transferred an additional 200 shares directly to Clara Treat. Incorporated in each trust instrument was the following language: "WHEREAS the Settlor desires to relieve himself of some of the responsibilities of corporate management; and "WHEREAS the Settlor is and has been for many *147 years interested in the betterment of the beneficiaries subsequently named under this trust agreement; and "WHEREAS there are other urgent and equally important reasons involving the peace of his family which make the creation of this trust desirable to the Settlor. * * *"
Anna B. Anderson was named trustee in three of the trust agreements, two covering 100 shares each and the third 199 shares. George J. Belknap, was the beneficiary for life of all three trusts. On his death the remainder interests devolved to his two children, his wife, and on certain contingencies to the donor's four other grandchildren. Clara Treat was designated trustee of the other two trusts, each of which covered 100 shares. Hers was the income for life with the remainder interest over on her death to her two children, and if they predeceased her, then to the donor's remaining grandchildren. During the year 1929, the Company, in round figures, made a profit of $13,000. For the next six years it sustained an average loss of about $32,000 per year. In 1936 and 1937 profits of $5,161.93 and $2,632.51, respectively, were earned. A loss of $38,416.01 was sustained in 1938. A $3,000 aggregate dividend *148 was paid by the Company during this ten-year period, on September 15, 1936. Decedent's salary as president averaged $7,229.17 that decade, the top figure paid being $10,000.01 in 1937. The Belknap Manufacturing Company never gave out credit statements and never furnished financial statements to Dun & Bradstreet. Throughout 1937, and as late as February 26, 1938, the Bridgeport City Trust Company, which was the company's bank, advised the National Credit Office that the Company maintained very substantial balances, that it requested no loans, and that it was sure that the Company was in good financial position. The first knowledge that the bank had of the cancellation of the notes of the Company held by decedent was obtained by the bank on May 11, 1938. Decedent filed a gift tax return for the calendar year 1938 in which he reported gifts of 1,198 shares of Company stock, valued at $132.68 per share for a total valuation of $158,950.64. Nine exclusions of $5,000 each were claimed, plus the specific exemption of $40,000 leaving total net gifts for the year of $73,950.64, and disclosing a tax liability of $4,464.82 which was paid. On the bottom of a schedule attached to the gift *149 tax return, which schedule listed the gift and donee's name, was this language: "Motive for all gifts - Betterment of beneficiary - Peace in family - Entering speculative business." Prior to the summer of 1938 decedent placed envelopes containing cash in a special, secret compartment of the Company safe. He informed Anna B. Anderson, the Company bookkeeper, of his action and specifically charged William Belknap, 3rd, with the responsibility of giving the money to the people whose names were listed on the several envelopes. Decedent often made promises of gifts to relatives and employees in inconsequential amounts and, although well meant, he did not always live up to them. On several occasions he remarked that he intended at his death to care for his older sister, Kate. On a few of her birthdays and once at Christmas he gave her cash gifts ranging from $25 to $100. Several times he bought coal for her and one one occasion gave her a hearing aid. After William, Jr.'s, death decedent saw to it that William's son, William, 3rd, had an education. Another grandchild was given similar assistance. He made a gift, the value of which is not shown, to a church that he attended during *150 his occasional trips to Florida. In addition, he built his first wife a garage and bought her an automobile some time after their divorce. Decedent and an employee, Edwin Meyer, had jointly engaged, over a period of time prior to 1938, in the invention and development of a new type of electrical sign. Decedent was serious and enthusiastic about promoting the development of this sign and envisaged significant profits from its exploitation. On January 8, 1938, decedent and Meyer executed a partnership agreement drafted by Saden, providing for cooperation in the development of the sign and agreeing to share the profits equally. Meyer left the employ of the Company in 1941; interest in the sign waned, and there were no further developments. George Belknap suffered a heart attack in late 1938 and left the employ of the Company never to return. On February 2, 1939, George became indebted to decedent on a mortgage note for $8,000. The note bears endorsements of payments of interest and principal as follows: Interest
Principal
December 22, 1941
$1,390.67
$2,109.33
December 22, 1942
353.44
400.00
Beginning in December, 1940, decedent was afflicted with a *151 series of ailments. At that time he had a sudden onslaught of a strangulation of the epigastric or umbilical hernia which necessitated an operation. While in the hospital he developed a slight jaundice, indicating gall bladder trouble. On August 7, 1941, decedent resigned as president of the Company due to advancing years. William Belknap, 3rd, succeeded him in that job and decedent was elevated to chairman of the board of directors. At various times from 1941 to March, 1944, decedent consulted and submitted to treatment by his physician for various distresses caused by gall bladder disturbances and hernia. On March 31, 1944, he consulted his physician, complaining of abnormal distress, and after consultation was advised to have his gall bladder removed. The operation was considered advisable because his general health otherwise was so good that there would be an advantage derived from having his major complaint cured. The operation was performed April 6, and appeared to be successful. Decedent was discharged from the hospital April 29, 1944. Subsequently, however, he became violently ill and was readmitted to the hospital on June 5, 1944. Two days later he died. The cause of *152 death was given as suppurative cholangitis and hepatitis, resulting when a stone obstructed the common duct, thereby causing multiple liver abscesses. But for that condition decedent had prospects, considering his age, for indefinitely continued good health. As early as February, 1934, decedent had executed a will. Late in 1939 he executed another will, which had been drafted for him by Saden, his legal adviser, on the 1938 transfers of stock. Decedent's last will and testament was executed December 22, 1941. Pauline Belknap was bequeathed his one remaining share of Company stock. To his wife, Eva, he devised life use of his home and made her the life income beneficiary of a trust embodying one-third of his residuary estate. The will was drafted to leave Eva the least dower interest required by Connecticut law. On Eva's death the trust was to terminate and the corpus divided equally between Pauline Belknap and Clara Treat. The remaining two-thirds of the residuary estate was devised and bequeathed absolutely to the last-mentioned beneficiaries. Lorin W. Willis, then a busy practicing attorney in Bridgeport, Connecticut, as well as State's Attorney for Fairfield County, Connecticut, *153 was engaged as attorney for decedent's estate. Willis was not an expert on tax matters. Shortly after decedent's death Willis offered his will for probate. George Belknap, through his attorney, contested the will on the grounds that decedent was of unsound mind and unduly influenced. Appeal was taken immediately to the Superior Court where it remained until September 20, 1945, at which time it was assigned for special hearing, and the contest was withdrawn. William Belknap, 3rd relied on Willis to handle the legal affairs of the estate, including filing of an estate tax return. He told Willis about the stock transfers in 1938 and gave him information relating to the size of the gross estate. Willis relied on William, 3rd for such information and was led to believe that the estate totaled about $40,000. On October 26, 1944, William, 3rd told Willis about the gifts of cash decedent had left in a secret compartment of the Company safe. Investigation of the compartment revealed $12,000 in currency contained in eight envelopes on which was written in decedent's handwriting the names of the donees. During the latter part of 1944 or within the first month or so of 1945 Willis was advised *154 by the executors that decedent left at his death some bank accounts with survivorship provisions. The tax return when filed revealed five accounts totaling $14,527.60. On April 17, 1945, Willis was requested by the Inheritance Tax Division of the State of Connecticut to file in the Probate Court all joint bank accounts in which decedent had an interest. This letter was followed by letters on May 17 and June 20, 1945, the latter also asking Willis to file the appropriate form reporting all anti-mortem transfers decedent made. On June 21, 1945, Willis answered that the form covering joint accounts had been filed with the Probate Court and enclosed the duplicate of the form filed; no reference to ante-mortem transfers was made. On June 26, 1945, the department reminded Willis that he had not filed the form reporting ante-mortem transfers by decedent. Willis replied June 30 that the form would be submitted along with the State succession tax return within a short time. Thereafter, on five occasions between July 12, 1945, and November 27, 1945, the department wrote Willis admonishing him to file the succession tax return. On November 27, 1945, Willis answered that appeal from probate *155 of decedent's will had been settled and that he hoped to file the State succession tax return within the next two weeks. Additional letters requesting filing of the succession tax return were sent on June 13 and July 22, 1946. Neither letter was acknowledged by Willis. By letter dated August 12, 1946, Willis filed the Connecticut succession tax return for the estate. He did not file the return sooner because of the pressure of other matters which required his presence in Court at all times. Prior to the time of filing that return he did not see all the figures together representing the gross estate and did not appreciate the fact that the estate was within the provisions of the Federal estate tax. An estate tax return was filed by the executors with the collector for the district of Connecticut on August 14, 1946. The return, prepared by Willis, disclosed a gross estate of $77,210.98, deductions, other than specific exemption, totaling $13,352.78, and a total estate tax due of $115.75. In his notice of deficiency respondent determined that the transfers by decedent in April, 1938, of 1,198 shares of Company stock were includible in decedent's gross estate as transfers under *156 section 811 (c) of the Internal Revenue Code, and that the fair market value of the stock at the date of death was $194.2353 per share. The gross estate was increased by $232,693.89 on account of the said 1,198 shares. This valuation is not contested. Respondent further determined that the transfer by decedent of $72,500 in notes payable to him by the Company, to the capital surplus account of the Company, was a transfer under section 811 (c) of the Code and includible in the gross estate in the proportion that 602 shares, the shares attributed to owners other than decedent, bears to 1,800 shares, the total outstanding stock of the Company. The gross estate was increased by $24,247.22 in respect of this item. Respondent also determined a 25 per cent addition to the tax because of failure to file the return on time. This addition, amounting to $16,570.91, is included in the $82,738.78 deficiency. George Belknap was called and duly sworn as a witness for and on behalf of respondent at 11:00 A.M., May 9, 1950. At 12:30 P.M. the hearing was recessed to reconvene at 2:00 P.M. Direct examination, resumed at 2:00 P.M., was continued until about 3:05 P.M., when hearing *157 was recessed for ten minutes. Beginning at 3:15 P.M., direct examination was again resumed, lasting this time until shortly before 5:00 P.M., when George was excused for the day at the suggestion of respondent. George again resumed the stand at 10:00 A.M., May 10, and direct examination continued, with the exception of a ten-minute recess in midmorning, until 12:03 P.M. After about 15 minutes of the afternoon session beginning at 2:00 P.M., direct examination was completed. Frequently during direct examination there were interruptions relating to the relevancy and materiality of the testimony. George was cross-examined for about an hour beginning about 2:15 P.M. Testimony was then suspended for about 20 to 30 minutes, during which time there was a discussion between the Court and counsel and a ten-minute recess. George resumed the stand thereafter and cross-examination was continued, with time out for another ten-minute recess, until shortly before 5:00 P.M. The next morning, May 11, 1950, George's heart condition was such that he was unable to resume the stand. Thereupon petitioner moved to strike all of his testimony. Respondent countered with a motion that the case be continued *158 to some future date for the purpose of completing examination of the witness. On May 12, in response to this latter motion and by agreement of counsel, the Court ruled that the case be continued to August 14, 1950, at Bridgeport, Connecticut, George's home city. George's condition was not improved when the Court subsequently convened in Bridgeport. He was still unable to testify and his condition was such that according to medical evidence further cross-examination would have seriously endangered his life. In view of these facts the Court rejected a motion made by respondent for a further continuance, and reserved judgment on petitioner's reiterated motion to strike George's testimony and evidence relating thereto. Ultimate Finding Decedent's transfers of Company stock and his contribution to the capital of the Company of the two notes said Company owed him were not made in contemplation of death. Opinion Our ultimate finding that decedent's transfer of Belknap Manufacturing Company stock six years before his death was not made in contemplation of that event is based upon what appears, from a scrutiny of the entire record, to have been his primary motive. We are entirely *159 satisfied that before the transactions were ultimately consummated decedent did envisage that tax liability would be affected, and it may even be that he recognized the connection between his proposed action and the condition of his estate. See Allen v. Trust Co. of Georgia, 326 U.S. 630, 635. But the program was worked out in meticulous detail before the services of a tax consultant were obtained; and only after decedent's plans were thoroughly considered with the attorney by whom the documents were drafted was tax advice resorted to. This seems to us to demonstrate preponderantly that decedent's decision to make the transfers must have originated in the other motives described, and hence that the effect upon his estate - his contemplation of death - could not have been the generating concern. Cf. First Trust & Deposit Co. v. Shaughnessy (C.A. 2), 134 Fed. (2d) 940, certiorari denied, 320 U.S. 744. It is, of course, that primary motive which we are admonished to ascertain. United States v. Wells, 283 U.S. 102. The only significant change [2] suggested by the tax adviser affects not the Belknap Company stock but the indebtedness *160 due decedent by that Company and which he forgave or contributed to the Company's capital at that time. In this respect the plan was altered, for avowed estate tax purposes, so that the indebtedness was to be forgiven immediately instead of at decedent's death as originally planned. In order to benefit the income tax situation of the Company, an annuity to be paid by it was eliminated and a salary agreement executed. Here again, however, the basic plan was one of long standing. The contribution to capital could have been, and was in fact, made immediately instead of being postponed. But in a sense that amounted to no more than decedent's decision not to make the contribution in a manner which might, except for his consultant's advice, have amounted to a transfer to take effect at death. In sum, the contribution to capital was hardly a donation to the inanimate impersonality of the Company. And if viewed as a gift to the other stockholders it was a present transfer with no different basic motives, as respondent himself insists, than the transfer of the stock itself. The dispositive *161 finding has been made accordingly. This brings us to a consideration of respondent's alternative determination - that the transferred property was includible under 811 (c) because decedent, by means of the salary agreement, retained the income from the property. Although we recognize the force of respondent's point that it is the earlier conclusion in Estate of Pamelia D. Holland, 47 B.T.A. 807, rather than the supplemental opinion, 1 T.C. 564, which is here applicable since the transfers presently in controversy were later than 1931, we have nevertheless concluded that it is Estate of William F. Hofford, 4 T.C. 790, which governs the present facts. This decedent was required to perform services; he continued to work for the Company as Chairman of the Board; the salary provided was not apparently unreasonable; and the stock itself was subject to no such rigid control by decedent as appeared in the Holland case. We conclude that none of the transfers were includible under any provision of 811 (c). A word needs to be said as to petitioners' motion to strike the testimony of respondent's witness, George Belknap. The question involved is intriguing, *162 and is entitled to more extended consideration than these facts warrant. The motion to strike is being denied, not because the requirement that cross-examination be completed is more rigid at law than under classic equity concepts, though that may be true, see e.g., Davies v. Otty, 35 Beav. (Eng.) 208, nor because the rules of evidence in equity cases in the District of Columbia, by which the Tax Court is bound, Internal Revenue Code, section 1111, may have embraced the early British equity doctrine that admission of testimony not tested by completed cross-examination is properly a subject for exercise of the Chancellor's discretion, see Scott v. McCann, 76 Md. 47, 24 A. 536, though that also may be true. See Gass v. Stinson ( C.A. 1), 3 Sumn. 98. But see D.C. Code, section 14-103; U.S. Supreme Court Equity Rules No. 46. Denial of the motion is due to our conclusion that certain parts of the testimony should be accepted as a basis for our findings since they were either well corroborated or covered by so much of the cross-examination as could be completed before the witness was taken ill, but that even as to this material, *163 the factual result in petitioners' favor will not be disturbed. Granting of the motion in its entirety would hence be virtually dictum. On the other hand, even the equity rule does not and could not require that all of the evidence be adopted without qualification, and, indeed, respondent scarcely advances so broad a contention. See 5 Wigmore "Evidence" (3rd ed.), 1390. It follows that denial of the motion is required without passing upon the interesting legal question which a sharper evidentiary conflict might otherwise have required. Finally, the penalty question appears to be eliminated by our conclusions on the substantive issues. The statement to that effect in petitioners' brief is not challenged by respondent. By reason of a claimed overpayment, Decision will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: William L. Belknap, 3rd, (As alleged transferee of the Estate of William L. Belknap, deceased); Clara Estelle Treat (As alleged transferee of the Estate of William L. Belknap, deceased); Barbara B. Grimes (As alleged transferee of the Estate of William L. Belknap, deceased).↩
2. The number of donees of the stock was also increased to enlarge the exclusions from gift tax.↩