Robert R. DUNCAN, Executor,

v.

UNITED STATES of America.

Civ. A. 55–436.

United States District Court
D. Massachusetts.

Feb. 6, 1957.

Roger P. Stokey, Goodwin, Procter & Hoar, Boston, Mass., for plaintiff.

Anthony Julian, U. S. Atty., Andrew A. Caffrey, Asst. U. S. Atty., Boston, Mass., for defendant.

FORD, District Judge.

This is an action by the executor of the estate of Walter H. Langshaw to recover a payment of an estate tax deficiency assessed by the Commissioner on the basis of the inclusion in the estate of decedent of the corpus of a certain trust established by decedent in 1934 for the benefit of his daughter and her issue.

The trust instrument provided that the trustees were to pay the income of the trust to the daughter during her life, and that in any year when the income should be less than $5,000, they in their discretion might pay her from principal the difference between the actual income and $5,000. The trustees also had the

power to determine what property coming to the trust should constitute income and what should constitute principal, and to determine whether charges and expenses should be allocated against principal or income. The settlor and a corporate fiduciary were named as the original trustees. Decedent on July 19, 1946, resigned as trustee and named his son-in-law, Samuel C. Burns, as his successor. Decedent died on March 19, 1947.

It is the contention of the United States that by virtue of these provisions of the trust the decedent had reserved to himself as trustee the right to designate the persons who should possess or enjoy the property or income therefrom, and a power to alter or amend the trust, and that his resignation as trustee constituted a relinquishment of these powers made in contemplation of death within the meaning of §§ 811(c) and 811(d) of the Internal Revenue Code of 1939. 26 U.S.C.A. §§ 811(c) and 811(d).

It is admitted by the answer that decedent subsequent to his resignation as trustee did not possess any power which would cause the value of the trust to be included in his gross estate. He possessed no such power then, at death, and assuming that he did up to July 19, 1946, possess such powers, there is no basis for including the value of the trust in his estate unless his resignation as trustee amounted to a relinquishment of these powers in contemplation of death.

Walter H. Langshaw in July, 1946, was eighty-seven years of age. He had led a vigorous and active life. Starting work in a mill at the age of nine, he had become a successful textile manufacturer. His estate at the time of his death was over a million dollars and he had during his life distributed over a million dollars in gifts. He had retired as president of his business, Dartmouth Manufacturing Co. of New Bedford, in 1933 but thereafter remained active in the management of his investments, and continued other interests in music and politics. About 1942, because of his wife's poor health, he had closed his home in New Bedford and moved with her to Boston where they lived with their daughter and son-in-law.

In 1946 he was in generally good health for a man of his age. His only serious physical ailment was the fact that his eyesight had been gradually failing for a number of years. In 1946 he was almost blind, being able to read only the largest newspaper headlines. He was able to get up daily and walk about the house, but his failing vision kept him from going up or down the stairs unaided, or from going outside the house alone, and two nurses had been hired to take care of him. He was not, however, receiving any regular medical treatment. The newspapers were read to him, and he continued to show a lively interest in current events and particularly in local political activities.

Because of his failing eyesight he could no longer read the financial pages of the newspapers, nor could he study the various documents submitted to him by his co-trustee in connection with the trust. He also found it difficult to sign his name. Prior to July 1946 there had been several instances where he failed to attend promptly to papers submitted to him by the co-trustee for his signature. In the summer of 1946 he told his son-in-law that he wished the son-in-law to take care of these matters in the future, and asked him to inquire as to the procedure for making the son-in-law co-trustee in his place. After consultation with the trust officer of the bank a letter of resignation was prepared for him which he signed on July 19, 1946. In this letter he stated "Because of advancing years I feel unable to continue as trustee under the Declaration of Trust, dated December 26, 1934, from Walter H. Langshaw for the benefit of Eunice Langshaw Bullard et al. Therefore, I hereby resign as trustee." The letter named the son-in-law as successor-trustee.

Early in 1947 decedent required medical treatment for a sore on his heel caused by circulatory difficulties. This sore was healed. On March 19, 1947, he died of

pneumonia after an illness of only a few days.

■■■ Whether or not the decedent's relinquishment of his powers was made in contemplation of death is a question to be decided on the facts of each particular case. Allen v. Trust Co. of Georgia, 326 U.S. 630, 636, 66 S.Ct. 389, 90 L.Ed. 367. The statutory presumption that certain transfers made within two years prior to death were made in contemplation of death no longer applies when the contrary is shown by the facts. The essential question is what was the motive which led the decedent to make the transfer. Advanced age is a factor to be considered, but it is not in itself decisive of the issue. United States v. Wells, 283 U.S. 102, 118, 51 S.Ct. 446, 75 L.Ed. 867; Parish's Estate v. Commissioner, 7 Cir., 187 F.2d 390; Estate of Johnson, 10 T.C. 680. A transfer is made in contemplation of death when made from a motive associated with death, such as the desire to avoid estate taxes, or to make the transfer as a substitute for a testamentary disposition. Regulations 105, Section 81.16, 26 C.F.R. § 81.16. The thought of death must be the dominant, impelling or primary motive (though not necessarily the sole motive) for the transfer. United States v. Wells, supra, 283 U.S. at page 118, 51 S.Ct. at page 452; Estate of Johnson, 10 T.C. 680; Estate of Delany, 1 T.C. 781; Estate of Belknap, 10 T.C.M. 769, 776. A transfer is not made in contemplation of death where the primary motive is a purpose associated with life. Among such purposes is that of relieving the donor of the cares and burdens of management of the property involved. United States v. Wells, supra, 283 U.S. at page 118, 51 S.Ct. at page 452; First National Bank of Boston v. Welch, D.C., 24 F.Supp. 695.

In the present case there is no evidence that decedent ever spoke of death in connection with his resignation as trustee. There is no evidence that he ever discussed the tax effects of his resignation. The evidence rather indicates that his primary reason was the fact that failing vision made it difficult for him to carry on his duties as trustee. Under the circumstances it seems clear that he was no longer able to perform these duties in the way he had been performing them and in which he thought they should be performed. It seems a fair conclusion that his dominant motive in resigning was to relieve himself of duties he felt he was no longer able to perform properly, turning the responsibilities over to someone else in the family who was able to assume them.

Another factor supports this conclusion. Decedent's estate apart from the trust here involved amounted to more than one million dollars. The value of the trust corpus at his death was $149,954.88. He did nothing to transfer any of the rest of his estate from his control prior to death. It would be difficult to conclude that a reduction of his estate tax was a dominant motive in his resignation as trustee while he made no effort to dispose of the great bulk of his property so as to bring about any reduction in such tax. Routzahn v. Brown, 6 Cir., 95 F.2d 766; Estate of Delany, 1 T.C. 781.

■■ On the evidence here the finding is that decedent's dominant motive in resigning as trustee was to relieve himself of duties he felt he could no longer properly perform, and that the relinquishment of his powers as trustee was not made in contemplation of death.

Plaintiff further claims an overpayment based on his claim for a deduction of $12,500 for expenses, including counsel fees, incurred in connection with his claim for refund and his prosecution of the present action. The only objection of the United States to the allowance of this claim is based on the provisions of § 910 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 910, which provides that the amount of any refund shall not exceed the portion of the tax paid during the three years preceding the filing of the claim. The claim for refund here was filed on July 14, 1952.

The original estate tax payment was made in 1948. The only payment within the three years preceding the filing of the claim was made on October 6, 1950, when a payment was made in the amount of $52,781.70, representing a deficiency assessment of $46,682.31 based on the inclusion in the estate of the trust property here involved with interest in the amount of $6,099.39.

■ Since on the findings on the main issue plaintiff is entitled to recover the full amount of the only payment made within the three years preceding his refund claim, the question arises whether § 910 bars recovery of the overpayment which would result from allowance of the claimed deduction for expenses and counsel fees. The Treasury Department Estate Tax Regulations 105 make a distinction between the ordinary claim for refund and the claim for a deduction for attorneys' fees incurred in prosecuting the claim for refund. In § 81.96 of the Regulations, 26 C.F.R. § 81.96, dealing with claims for refunds, the last sentence of subsection (a) reads: "For deduction of attorneys' fees incurred in prosecuting a claim for refund, see § 81.34." § 81.34(b) provides: "(b) A deduction for attorneys' fees incurred in contesting an asserted deficiency or in prosecuting a claim for refund should be claimed at the time such deficiency is contested or such refund claim is prosecuted." Under this provision it has been held that it is sufficient to claim a deduction for attorneys' fees in the complaint in an action brought to recover an alleged overpayment, even though no claim for attorneys' fees had been included in the claim for refund filed with the Collector of Internal Revenue. Bohnen v. Harrison, 7 Cir., 232 F.2d 406. Thus it would seem that the claim for attorneys' fees for prosecuting a refund claim, so far as the time for making the claim is concerned, is governed by the special provision of § 81.34(b) of the Regulations, and not by § 81.96 of the Regulations and § 910 of the Code, on which § 81.96 is based. It would seem reasonable that

§ 910 should likewise be held not to bar recovery of an overpayment resulting from the deduction of such fees.

■ The taxpayer, of course, has no right to the deduction of attorneys' fees until such expense has actually been incurred. Where, as here, taxpayer pays a deficiency assessed after payment of the original tax, and then claims a refund, he still does not know, until the claim is rejected, whether he will ever have to incur the expense of prosecuting an action to recover the payment. At best, he can only go through the formality of claiming a refund based on a deduction to which he might become entitled sometime in the future. The strict application of § 910 would result in an inequitable treatment of such claims for deduction. A taxpayer such as plaintiff here who prevails to the extent of recovering the full amount of the deficiency payment made within the three years before the filing of his refund claim would be denied a deduction for attorneys' fees while the litigant who recovers less than the full amount of his claim might be able to secure the deduction. A taxpayer who has filed his return and paid his tax might receive a deficiency assessment notice on the last day of the three-year period following payment. In order to make sure that he would not find himself in the position of plaintiff here, he should, on the government's interpretation of § 910, file on that same day a claim for refund for the attorneys' fees he might incur several years later, if after paying the assessment he should decide to seek a refund, and then, in case the refund should be denied, he should decide to bring suit to recover the payment. Congress cannot have intended § 910 to require the taxpayer to indulge in such a futile formality in order to protect his right to a deduction to which he may in the future become entitled. The limitation on the amount of refund under § 910 does not require the denial to plaintiff here of the recovery based on the allowance of a deduction for attorneys' fees for the prosecution

of his claim for refund simply because he recovers the full amount of his claim and thus the full amount he has paid in the three years preceding his claim for refund.

Judgment for plaintiff in accordance herewith; interest and costs.