James F. WILSON et ux., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. No. 8510.

United States District Court
N. D. California, N. D.

March 3, 1965.

Richard W. Konig and Wareham Seaman, Sacramento, Cal., for plaintiffs.

Cecil F. Poole, U. S. Atty., Richard L. Carico, Ass't U. S. Atty., San Francisco, Cal., for defendant.

MacBRIDE, District Judge.

This is a civil action brought by plaintiffs, James F. and Margaret Wilson, to recover individual Income Taxes, penalties and interest allegedly overpaid for the calendar years 1953, 1954 and 1955. Jurisdiction is conferred upon the court by Title 28 U.S.C.A. § 1346.

Facts which are undisputed are substantially as follows: On August 1, 1949, plaintiff James F. Wilson, as a general partner (hereinafter referred to as the Professor or as Professor Wilson), and three New Zealanders formed a limited partnership under the laws of California wherein the Professor was given a 75% interest as a general partner and each of the New Zealanders an 8⅓ interest as limited partners. The partnership was formed to "manufacture, market and distribute a castrating and de-tailing instrument sold under the registered trademark 'Elastrator' * * * together with the rubber rings used in connection therewith. * * * " [1]

Some time between June 16, 1952, and August 11, 1952, one of the New Zealanders (Hammond) visited Professor Wilson in California. At this time John Wilson, the Professor's adult son, was then working for the company. The Professor, his son, and Hammond had some

[1] The device would expand a small but thick rubber "doughnut" so that it could be slipped up over the outside of the scrotum of a new lamb above its testicles. When the device is released, the rubber "doughnut" squeezes down around the scrotum, thus shutting off the blood supply to the lower scrotum and testicles. By atrophic process the testicles eventually drop off. The same application was made for de-tailing new lambs.

conversations about revamping the structure of the partnership to assure longevity to knowledgeable management. It was suggested that John Wilson be brought in as a general partner. They also discussed giving to the Professor's other children or grandchildren an ownership interest in the business, but no definite percentage was agreed upon at that time, and the expression of Professor Wilson was no greater than that he "intended" to make these changes. He did not say how they would be accomplished. The Professor and his son discussed the fact that if the Professor conveyed a part of his interest to John, then there would be a reduction in the Professor's Income Taxes and an increase in John's Income Taxes.

There was evidence that John wrote to two of his sisters advising them of the Professor's intentions, and the Professor told the widow of his deceased son, Robert, that he intended to make the changes.

In August, Professor Wilson consulted an attorney concerning his desires and intentions, telling him that he wanted to give "one fifteenth of the whole shebang" to each of the three living children and to the Trustee for a trust to be set up for the children of his deceased child. The attorney referred him to another attorney more versed in tax, estate and business law. The latter, Mr. Alfred Holland, conferred with the Professor initially in September, 1952. On December 31, 1952, a trust agreement was executed by Professor and Mrs. Wilson in favor of their deceased son's children, but the corpus of this trust was shares of stock in a corporation which owned the patents on the "Elastrator" device. The Trustee of this trust will be hereafter referred to as the Trustee.

On March 10, 1953, Professor Wilson and his wife executed four separate assignments in favor of each of the living children and the Trustee conveying to each one-fifteenth of his 75% interest in the limited partnership. Each assignment spelled out that it was intended to convey a 5% interest in the partnership and its "properties and assets."

An Amended Limited Partnership Agreement dated April 1, 1953, was signed some time prior to June 30, 1953, by all of the parties to the instrument. The instrument recited that it should have "the same force and effect as if it were signed on April 1, 1953." Under the terms of this new agreement, the J. F. Wilson Associates, Ltd. Company was to be owned 55% by the Professor and 5% by John respectively as general partners. All of the other owners were listed as limited partners as follows: The New Zealanders each continued their 8⅓ percentage of ownership, and the Professor's three living children and the Trustee were shown as owning 5% each. The agreement provided, "The contributions of each partner shall be deemed to be that percentage of the total net worth of the said former partnership which is set forth opposite his name in paragraph 3 herein." Paragraph 3 of the agreement set forth the percentages indicated above.

Under the terms of the new agreement, all limited partners were treated equally. The new agreement was recorded June 30, 1953.

The record is not clear as to the exact or even approximate date on which Professor Wilson instructed his stepfather, F. L. Davies, the eighty-six year old bookkeeper for the firm, to enter the names of the new partners on the books for the amount of their respective interests. Instead of diminishing Professor Wilson's capital account by 20% and showing a 5% interest in each of the new partners, Mr. Davies left the Professor's capital account unchanged and merely credited each of the new partners with 3.75% of the profit for the 1952–53 fiscal year ending June 30, 1953. He diminished the Professor's share of the company's profit by 15% of the total profit. When John discovered this alleged accounting error, he claims he pointed it out to Mr. Davies who in turn argued that each of the new limited partners was entitled only to 3.75% of

the total. John also claims that he protested to his sisters and sister-in-law that they had some additional money coming from the company. He was unable to produce copies of the letters that he wrote these people; however, the statement remains uncontradicted in the record. No capital investment on the part of the four new partners was shown on the books of the company during any of the three years in question.

The fiscal year for the partnership ran from August 1 to July 31. The books were not closed as of the date of the new agreement, nor was a physical inventory or income statement from August 1, 1952, taken for either March 10, 1953, or April 1, 1953. On both March 10, 1953, and April 1, 1953, the company owned dies, machinery, office equipment, a truck, scales and other equipment necessary for its operation. Additionally, it owned an inventory of the products it marketed. We don't know the total net worth or capital of the business as of either March 10 or April 1, 1953, but the parties have stipulted that the total "net worth or capital of the business" at July 31, 1953, was $105,056.78.

As of April 1, 1953, John was working full time in the business. Neither the daughters or the Trustee for the minor grandchildren took any part in the management and rendered no service to the business during any of the years in question.

As indicated above, only 3.75% of the company's income was paid to the new partners (John included) for the fiscal year ending July 31, 1953. The Professor received 60% of the profit for that year. For the fiscal year ending July 31, 1954, these same partners received only 3% each of the income, and the Professor received 63% of the income. In the next year each of the new partners received 4.8% of the partnership income, and the Professor received 55.8%. These allocations for the fiscal year ending July 31, 1955, however, were reversed on the company books as to the two daughters and the Trustee following an audit by the Internal Revenue Service. The share al-

ready distributed to them was charged back to Professor Wilson. Later, when the partnership return was filed for the 1954–1955 fiscal year, it did not reflect any allocation or distribution of income to the two daughters or the Trustee. For fiscal year ending July 31, 1956, no income was allocated to either the daughters or the Trustee on either the books of the company or on the partnership return. John's 5% share was, however, recognized. Eventually, in August, 1957, the daughters and the Trustee each received 5% of the income for the fiscal year ending July 31, 1956, and at the time of payment the allocation was entered on the books of the company.

Payments of available income from the company were evidently made as the partners needed money. The determination of the amount and availability was made by the Professor or John or Mr. Davies. I gather from the record that the determination of the amounts to which the respective parties were entitled when they asked for money was "estimated" rather than accurately computed. It also appears in the record that F. L. Davies was confused in his understanding of ownership rights of the new partnership, and he continued this confusion over to John whom he taught to keep the books of the company.

Although it is no longer important to this decision, it must be noted that in 1953 there was organized a general partnership known as Wilmark Company the purpose of which was to manufacture and market a permanent marking device for livestock. The Professor, his three living children and the Trustee were all listed as general partners on the recorded Certificate of Partnership. No partnership agreement was ever brought into the record. Initially in the case a dispute existed between the plaintiffs and the government over allocation of losses from the Wilmark operation. The parties have now agreed that the entire loss of the company shall be allocated to Professor Wilson. This matter no longer concerns us except for making the necessary computations needed for the

judgment that will result from the decision reached on all issues involved in this action.

As a result of an audit of plaintiffs' income returns for 1953 and 1954, deficiencies were proposed for both years based on reallocation of profits and losses paid to or taken by the two daughters and the Trustee in connection with both the Wilson Company and the Wilmark Company. Additionally, a penalty was proposed under section 294(d) (2) of the Internal Revenue Code of 1939 for substantial underestimation of plaintiffs' 1953 Income Tax. Deficiencies were assessed on the basis of these adjustments on February 28, 1957, in the following amounts:

| Identification | 1953 | 1954 |
|---|---|---|
| Income Tax | $5,418.82 | $4,517.54 |
| Interest | 791.96 | 366.60 |
| Section 294(d) (2) (Underestimation) | 1,131.04 | |
| Subtotal | 7,341.82 | 4,884.14 |
| Credit | 292.75 | |
| | 7,049.07 | 4,884.14 |

These assessments were collected from plaintiffs on March 18, 1957.

The 1952–1953 partnership return was prepared by Mr. Davies. Although he showed nothing credited to partnership capital for the four new partners, he did show each of them receiving 3.75% of the partnership income. A Mr. Raymond J. Bell, public accountant, prepared a financial statement for the company on September 10, 1953. In his recapitulation he also ignored both the terms of the assignments and the new limited partnership agreement and showed nothing transferred to capital for the four new partners as of July 31, 1953, except an amount equal to 3.75% of the 1952–53 profit.

Mr. Davies did the same thing on the 1953–54 return when he showed only income as capital for the new partners. As indicated above, this only amounted to 3% of the income for each of the new partners. Accountant Bell's financial statement filed September 2, 1954, repeated the 1952–53 erroneous procedure. He ignored the terms of the assignments and the new partnership agreement, and as capital for the new partners showed only the income that was on hand credited to the new partners as of July 31, 1953, and for net worth for each of the new partners as of July 31, 1954, he merely reflected the changes in the starting net worth as it was affected by additions to and withdrawals from the net worth account during the year.

As previously stated, the return Davies filed for 1954–55 showed nothing credited to the new partners for either capital or income. However, the financial statement prepared by Bell on August 15, 1955, reflected that each of the new partners had a "net worth" interest in the business as of July 31, 1955; that a percentage of the profits for 1954–55 were allocated to each of them and that the net worth of each of them as of the close of business July 31, 1955, reflected the profit additions to the account and their withdrawals therefrom during the year. At no time did either Davies or Bell ever reflect in the income tax returns or financial statements prepared by them for the partnership business the transfer of 20% of the business from the Professor to the four new partners in divisions of 5% each. Plaintiffs' joint income tax return for the calendar year 1955 included 75% of the reported income of the Wilson Company for that partnership's fiscal year ending July 31, 1955.

On February 9, 1959, plaintiffs filed claims for refund of $7,018.71, $4,487.05 and $1,050.71 paid by them as taxes, penalties and assessed interest for the calendar years 1953, 1954 and 1955 respectively. In their claim the plaintiffs alleged that the interests of the two daughters and the Trustee in both the Wilson and Wilmark partnerships should have been recognized by the government

and that neither the profits or losses allocated to those persons by the respective partnerships should have been reported by the plaintiffs. Their claim for 1953 also demanded recovery of the section 294(d) (2) (underestimation) penalty. All of these claims were denied on March 30, 1961.

On July 19, 1962, plaintiffs filed "Amended" Claims for Refund of $9,474.89 and $6,684.37 for the calendar years 1953 and 1954 respectively. The claims were identical to the original claims filed on February 9, 1959, except that they claimed that their income should have been reduced by credit allocation of 5% of the income of the Wilson Company for each of the three children and the Trustee for each of the two years in question. In short, they increased their claim for refund by 1½% of the company's income for each of the three living children and the Trustee for 1953 and by 2% of the company's income for the same persons for 1954. These "Amended" Claims were denied on January 30, 1963.

No part of the taxes, penalties or interest paid by plaintiffs for the calendar years 1953, 1954 or 1955 has been refunded, and this action was brought by plaintiffs to recover all of the money so paid.

Trial of this matter commenced on March 26, 1963. Some time between March 22, 1963, and March 25, 1963, defendant served upon plaintiffs notice of motion to amend its answer at time of trial. Specifically, defendant sought to raise the defense that the court was without jurisdiction to adjudge a refund to plaintiffs for any money paid by them to defendant prior to February 9, 1957, because of the limitations contained in Section 6511(b) (2) of the Internal Revenue Code of 1954, and corresponding provisions of prior Internal Revenue laws. A memorandum in opposition to the motion was filed by plaintiffs on March 25. On March 26, 1963, prior to taking evidence or hearing argument on other aspects of the case, the motion to amend was argued. The court took the motion under submission to be disposed of at time of judgment and permitted defendant to present evidence in support of the answer to the same effect as if the amendment had been permitted subject to a motion to strike.

## DEFENDANT'S MOTION TO AMEND ITS ANSWER

■ The motion to amend defendant's answer will be granted. The separate defense set forth in the amendment sought to prevent plaintiffs from recovering any refund for the income taxes they paid for 1953 and 1954 on the amount of Wilson Company profit the plaintiffs contend the four new partners *should* have received for those two years as distinguished from the amount of profit they *actually* received for the same two years. More particularly, by its proposed amendment, defendant endeavors to stop plaintiffs from realizing any recovery from the amended claim they filed on July 19, 1962, almost five years and four months after the last payment of income taxes for either of these two years.

Section 6511(b) (2) of the 1954 Code provides in pertinent part as follows:

"Sec. 6511(b) (2) LIMIT ON AMOUNT OF CREDIT OR REFUND.

(A) * * *

(B) LIMIT WHERE CLAIM NOT FILED WITHIN 3-YEAR PERIOD.

If the claim was not filed within such 3-year period, the amount of the credit or refund shall not exceed the portion of the tax paid during the 2 years immediately preceding the filing of the claim.

(C) * * *." 26 U.S.C., 1958 ed., Sec. 6511(b) (2).

The sole question presented by the proposed amendment is whether the so-called "Amended" Claims for Refund were filed in time. This question presented no evidentiary problems. Neither the dates on which the income taxes for these two years were paid or the date on which the

amended claims were filed were in dispute.

Plaintiffs opposed the amendment on the grounds that it was offered in bad faith, but I am unable to assign any such implied motive or design to defendant. It is true defendant knew the facts upon which its amendment was offered well in advance of the date it offered its amendment, but except making more difficult the plaintiffs' case, there has been no trial or evidentiary prejudice to plaintiffs.

Plaintiffs have cited numerous cases where last minute amendments were disallowed, but these cases presented situations where the trial would have been delayed, Hession Hills Corp. v. Union Cent. Life Ins. Co., 1 F.R.D. 743 (S.D. N.Y.1941); United States v. Shuman, 1 F.R.D. 251 (N.D.W.Va.1940); Darcy v. North Atlantic and Gulf S.S. Co., Inc., 78 F.Supp. 662 (E.D.Pa.1948); or the court actually found bad faith on the part of the movant, Kuris v. Pepper Poultry Co., 2 F.R.D. 361 (S.D.N.Y.1941), or the amendment would cause the plaintiffs to lose a witness. Hespe v. Corning Glass Works, 17 F.Supp. 911 (W.D. N.Y.1937). Plaintiffs have been put to no extra cost and the amendment will not upset or affect any depositions they took prior to trial, nor, in fact, did it present any evidentiary problems whatever to the plaintiffs. Finally, the proposed amendment did not effectively catch plaintiffs unprepared to argue the legal merits of the motion for the reason that the matter was taken under submission, and the plaintiffs were given the opportunity to argue the motion at length in their opening and closing briefs after trial.

The holdings of the ruling cases on this point are well summarized in 3 Moore's Federal Practice, 2d ed. at p. 874 as follows:

"Recognizing that the entire spirit of the rules is to the effect that controversies shall be decided on the merits, the courts have not been hesitant to allow amendments for the purpose of presenting the real issues of the case, where the moving party has not been guilty of bad faith and is not acting for the purpose of delay, the opposing party will not be unduly prejudiced, and the trial of the issues will not be unduly delayed."

Rule 15(a) Federal Rules of Civil Procedure provides in part as follows:

"* * * leave (to amend) shall be freely given when justice so requires."

The court is of the opinion that the facts of this case qualify for the extension of such leniency by the court.

## APPLICABILITY OF SECTION 6511 (b) (2) INTERNAL REVENUE CODE OF 1954 TO PLAINTIFFS' AMENDED CLAIMS

Plaintiffs have offered no sufficient reason why defendant's defense to the amended claims is not valid and applicable. Five years and four months elapsed between the time they made the last payments on their 1953 and 1954 income taxes on March 18, 1957, and the date on which they filed their amended claims for refund of taxes on the extra portion of income to which they claim the four new partners were entitled. No payment having been made within two years immediately preceding the claim, there is nothing allowed by the statute to be refunded or credited to plaintiffs arising from the "amended claims." Hutchens Metal Products, Inc. v. Bookwalter, 174 F.Supp. 338 (W.D.Mo.1959).

In an excellent discussion of the legislative history of Section 322(b) (1) of the 1939 Internal Revenue Code, the Supreme Court in Jones v. Liberty Glass Co., 332 U.S. 524, 68 S.Ct. 229, 92 L.Ed. 142, points out that plaintiffs can seek an income tax overpayment refund only by virtue of Section 322(b) (1). It is not a case of the taxpayer having a right that is limited by the statute, rather the

right to refund is granted by the statute, and it makes no difference whether the claim arises because of an error of the taxpayer or an error of an Internal Revenue Agent. The reasoning applied by the court with reference to Section 322(b) (1) of the 1939 Code can be applied with equal force to Section 322(b) (2) of that Code, and to Section 6511(b) (2) which succeeded Section 322(b) (2) in the 1939 Code.

█ Since the right to refund can be asserted only because of the existence of the statute, strict compliance with the provisions of the statute is demanded. Bechelli v. Hofferbert, 111 F.Supp. 631; Vaughn v. United States, 181 F.Supp. 386 (S.D.Cal.1959); Tobin v. United States, 264 F.2d 845 (5th Cir. 1959); United States v. Dempster, 265 F.2d 666 (6th Cir. 1959); Bell v. Gray, 191 F. Supp. 328, aff'd 287 F.2d 410.

█ As stated in Mill Creek & Minehill Nav. & R. Co. v. United States, 246 F. 1013 (D.C.Pa.1917), aff'd. 251 U.S. 539, 40 S.Ct. 118, 64 L.Ed. 404, the time stated in this type statute is a "condition of the remedy given" and not a statute of limitations in bar of the action.

Plaintiffs refer the court to Duncan v. United States, 148 F.Supp. 264 (D.C. Mass.1957) where the court allowed the taxpayer to recover expenses for attorney's fees incurred in connection with a claim for refund of an estate tax deficiency even though the amount sought to be recovered exceeded the tax paid during three years immediately preceding the filing of the claim for refund of the tax deficiency. Opposition to the recovery of the attorney's fee expense was based on Section 910 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 910, which provided that the amount of any tax refund shall not exceed the portion of tax paid during the three years immediately preceding the filing of the claim. Plaintiffs in the case at bar argue that Section 910 is similar to Section 6511 of the 1954 Internal Revenue Code and urge the court to treat these so-called "amended claims" in their case in the same manner the court dealt with the attorney's fees in Duncan. They argue further that once the court acquired jurisdiction over *a portion* of plaintiffs' income tax for 1953 and 1954 it gained jurisdiction over the entire tax paid, and its jurisdiction can not be restricted by Section 6511.

Plaintiffs' position on this point is untenable. Duncan, supra, involved expenses connected with an estate tax. We are dealing here with a claim for refund of income taxes. Section 6511 is the exclusive statutory provision for the recovery of "overpayment" of income taxes. As previously stated, unless there is a compliance with the section, then there can be no recovery. In Jones v. Liberty Glass Co., supra, the Supreme Court stressed the exclusivity, for income tax refund purposes, of the "Refunds and Credits" sections of the 1939 Code, which for the purposes of the case at bar are almost identical to Section 6511 of the 1954 Code when it stated at page 532, 68 S.Ct. at page 233:

"The legislative history further reveals a consistent intention to make a separate and complete limitation provision for income tax refund claims, whatever might be the underlying basis of the claims. Section 322 and its predecessors were devised in order to provide such an exclusive scheme."

Duncan is no assistance to the court in the case at bar for the further reason that in Duncan the claim for attorney's fees was governed by the special provisions of Section 81.34(b) of the regulations. We have no such special provision to assist the plaintiffs in their "amended claims."

There is nothing in the language of Section 6511 which permits the "tacking on" of a claim filed late to a claim that was timely filed in order to give the former the lively status of the latter. Even though the "amended claims" involved a part of the same tax with which the timely claims were concerned, they can not be given life by ancestry. They

were filed too late and are dead. Recovery will be denied.

## RECOGNITION OF THE TWO DAUGHTERS AND THE TRUSTEE AS LIMITED PARTNERS OF J. F. WILSON ASSOCIATES, LTD.

Although the record reflects that Professor Wilson and his son, John, were anything but careful in the care of their business books and in the stewardship of the office end of the business, I am satisfied that a new and valid limited partnership came into being, effective April 1, 1953, in which partnership the Professor had a 55% interest as a general partner, his son, John, had a 5% interest as a general partner, the three New Zealanders each had an 8⅓% interest as limited partners, and the two daughters and the Trustee each had a 5% interest as limited partners. Additionally, I am satisfied that the plaintiffs and all four of the new partners were entitled to recognition of their above indicated interest in the partnership for income tax purposes.

As pointed out in Kuney v. Frank, 308 F.2d 719 (9th Cir. 1962) and Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659, the question of whether a family partnership is real is one of fact not of law. The business records of the Wilson Company for the years in question cast great doubt on the validity of the partnership as to the four new partners, but I am of the opinion this doubt is overcome by the conduct, the manifest intentions and basic understanding of the partners and I find that Professor Wilson intended to and did, in fact, give each of the four new partners a 5% interest in the assets and income of the business. I further find that both he and the recipients of his gifts believe that he had completed the gifts.

If chaos was injected into this entire transaction, I believe it was started by Mr. Davies and fostered by Mr. Bell, both accountants upon whom the plaintiffs re-

lied, and to whom John deferred. There is nothing ambiguous or uncertain about the terms of either the assignments or the new limited partnership agreement. Whether the Professor told Davies that he was giving the living children and the Trustee a total of 15% of the entire company or that he was giving each of them one-fifteenth of his then interest in the entire company is a question I resolve in favor of the Professor, and I find that he instructed Davies to set up the books to show each of the new partners owning one-fifteenth of his 75% share or 5% of the whole. The fact that Davies did not follow his instructions can not destroy what the parties intended. He was shown the assignments and the partnership agreement by Professor Wilson, but he failed to make the proper entries in the books of the company for 1952–53. For 1952–53 he reduced the Professor's income down to 60% but continued his capital at 75%. At the end of 1952–53 fiscal year, John discovered the error and tried to get Davies to make the proper entries. He failed in his effort. He should have tried harder, but this unwillingness to argue further with his 86 year old grandfather is insufficient reason to defeat his 5% interest in the company.

■ Section 704(e) (1) of the 1954 Internal Revenue Code provides:

"A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person."

This regulation is subject to the restriction that the gift must be bona fide and the donor must have in fact relinquished dominion and control over the purported gift. Spiesman v. Commissioner of Internal Revenue, 260 F.2d 940 (C.A.Cal. 1958); Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788. Whether the donor has retained dominion and

control that will invalidate the gift for income tax purposes must be determined from all the pertinent facts and circumstances.

Defendant suggests that because Professor Wilson appeared to "draw at will" from the income of the business without adhering strictly to the percentages provided for in the new agreement, he thus demonstrated a continued control over what he had purportedly given away. I do not agree. An apt accountant or bookkeeper would have made simple entries to both the income and capital accounts of the various partners at the end of each fiscal year to adjust the accounts between those partners who had overdrawn and those who had underdrawn. It should have been done in this case at the end of each fiscal year. The fact that it was not done by either Davies or Bell was not, in my opinion, chargeable either to the Professor or the new partners.

■ Defendant points to the language of Treasury Regulation 118, Section 39.-191(b) (9) which provides in its definition of "capital interest" that the mere right to participate in the earnings and profits of a partnership is not capital interest in the partnership. Defendant suggests that at most the two daughters and the Trustee had only a right to participate in income, and, therefore, they were not partners within the meaning of the regulation. Again, I find otherwise. The new partners had more than a right to participate in profits. Both the assignments and the new agreement recite respectively that the new partners received certain assets, that they had transferred the assets to the partnership, and finally that they were entitled to distribution of the assets upon dissolution of the partnership. They owned capital interests in the new partnership. In forming the new partnership I find that all parties did so in good faith and with business purpose to carry on the business enterprise that was formerly owned solely by the Professor and the New Zealanders.

Defendant does not question the validity of John's partnership interest, yet his interest was created by the same instruments and at the same time as those of the two daughters and the Trustee. The only difference between the relationship is that John was given an interest as a general rather than a limited partner, and he participated actively in the business. But defendant's own regulations provide that, "The absence of services and participation by a donee in a limited partnership is immaterial if the limited partnership meets the other requirements prescribed by the section." Treasury Regulation 118, Section 39.191 (b) (9). I do not find the partnership agreement failed "to meet the other requirements prescribed by the section."

■ Defendant argues that Treasury Regulation 118, Section 39.191(b) (9), requires that a "limited partnership must be organized and conducted in accordance with the requirements of the State Limited Partnership Law" if the interests of the donee are to be recognized for income tax purposes. He cites Section 15502(1) (a)VI of the California Corporations Code which specifies that the Certificate of Limited Partnership shall indicate "[t]he amount of cash and description of and the agreed value of the other property contributed by each limited partner." In the case at bar no cash was contributed by the new limited partners, and the value of the contribution of the new partners was not spelled out on the certificate probably because no inventory was taken as of the moment the new partnership was created. The agreement provided, however, that the contribution of each partner "shall be deemed to be that percentage of the total net worth of the said former partnership which is set forth opposite his name in paragraph 3 herein." Paragraph 3 provided that each of the new partners was to have not only a 5% interest in the "firm" but that in addition he shall share the "profits and losses" of the firm in the same percentage. To comply with

what I believe was the true intent of the parties, a competent accountant should be able to complete with sufficient accuracy the capital accounts for the Professor and the new partners as of April 1, 1953, which resulted from the gifts on March 10, 1953. Such a computation would thus enable the new limited partners to meet the liability requirements of California Corporations Code Section 15517(4). I, therefore, believe the reference to their percentage of interest in the old partnership was sufficient to satisfy California Corporations Code Section 15502, particularly so in light of subsection (2) of that Section which provides: "A limited partnership is formed if there has been substantial compliance in good faith with the requirements of paragraph one."

■ Defendant urges that the new limited partnership should not be recognized because shortly after its formation the New Zealanders each drew out their capital contribution in violation of the provisions of California Corporations Code Section 15516(1), (2). Again, defendant cites Section 39.191(b) (a) of Regulation 118 that to be recognized for income tax purposes the partnership must be conducted in accordance with the requirements of applicable state law. Even though such conduct on the part of the New Zealanders may violate the statute, it is insufficient to destroy the recognition of the partnership with relation to the Professor and the four new partners. There is nothing in the record to show that the four new partners were parties to the action of the New Zealanders. They should not lose the benefits of their own limited partnership interest because of the action of other limited partners, especially where there was no family relationship between the New Zealanders and the four new partners.

Although valid memberships in a valid limited partnership are difficult to find in the record that is before me, I am, nevertheless, of the opinion that the intention and belief of the parties was that a new limited partnership had been formed, effective April 1, 1953, and that all four of the new partners were each owners of a 5% interest in the assets of the old business as of March 10, 1953. I am of the further opinion that this intention and belief when considered in the light not only of the terms of the assignments and of new limited partnership agreement, but also in the light of the conduct of all of the parties riding this omnibus of errors (Davies and Bell included) affords me justification to find, and I do so find, that for income tax purposes and for the amount of interest and in the class of partnership ascribed to them in the new partnership agreement, all of the four new partners became bona fide partners as of April 1, 1953, in a new bona fide limited partnership known as J. F. Wilson Associates, Ltd.

ALLOCATION OF PARTNERSHIP INCOME TO NEW PARTNERS FROM JULY 1, 1952, RATHER THAN MARCH 10, 1953.

■ Plaintiffs seek to have the allocation of partnership income to the new partners commence as of July 1, 1952, even though they did not acquire an ownership of any capital in the business until March 10, 1953, and were not admitted to partnership until April 1, 1953. Plaintiffs urge that since the company's fiscal year started July 1, 1952, and inasmuch as Professor Wilson indicated to Hammond some time between June 16, 1952, and August, 1952, that he *intended* to give to his children and his deceased son's children a part of his interest in the company and that he then set about to accomplish the object of his intentions, that the change in ownership should be "related back to the beginning of the 1952–53 fiscal year." The allocation requested by plaintiffs will be denied.

The fact that the Professor may have expressed his intentions to make future gifts to his children can not make the gifts effective on the day he expressed the intention. By his own admission he did not know how much of an interest he would give them when he was talk-

ing to Hammond, nor did he at that time know how he would bring them into the partnership. The finalization of this decision was not even started until he talked with attorney Alfred Holland in September, 1952, and there is nothing in the record in the way of statements or conduct on the part of the Professor or any of the donees to indicate that these gifts were to be effected any earlier than March 10, 1953, the day they were made. In December, 1952, the trusts were created for the children of the plaintiffs' deceased child, but at that time they dealt only with shares of stock of Elastrator Patents, Inc.

Plaintiffs rely heavily on Flitcroft v. Commissioner of Internal Revenue, 328 F.2d 449 (9th Cir. 1964) to support their contention that the effective date of the gift should be related back to July 1, 1952. In Flitcroft a provision had been overlooked by the drafter of a trust agreement that was required to make the trust irrevocable. The court allowed the overlooked provision to be inserted in the agreement and related its effectiveness back to the date of signing of the trust agreement. The case is not applicable here. In Flitcroft there was no question but that the agreement was to be effective on the date it was signed, and the court found the parties had the intention that it be irrevocable on the day it was signed. In the case at bar we have no indicated intention to make the gifts effective on any date other than the date on which they were made. Further, we have Professor Wilson's expressed intention that at some time in the future (after the Hammond meeting) he was going to make gifts to his children.

Plaintiffs also rely on Ginsburg v. Arnold, 185 F.2d 913 (5th Cir. 1950) where gifts of an interest in a partnership were made on February 21, 1942, and the partnership agreement was signed March 30, 1942. The agreement recited it was effective January 1, 1942. The court applied the test set forth in Culbertson v. Commissioner of Internal Revenue, supra, and found that "the business

should be taxed to the owners thereof in accordance with the partnership agreement." (p. 916 of 185 F.2d.) Presumably the court found the partnership effective January 1, 1942. Again, plaintiffs' cited authority is not applicable. In the case at bar, plaintiffs are not asking that they be taxed in accordance with the partnership agreement, the effective date of which is April 1, 1953. There is nothing in the language of either the assignments or the partnership agreement that suggests that the gifts should be effective on any date other than March 10, 1953.

Although I hold the partnership agreement to be effective April 1, 1953, I find the change in ownership as between plaintiffs and the four new partners to be effective March 10, 1953, and for income tax purposes the income to the plaintiffs and the four new partners shall be measured from that date.

### DIVISION OF 1952–1953 FISCAL YEAR PROFITS

Defendant suggests that even if the living children and the Trustee did acquire ownership interests in the partnership which under different circumstances might be recognized for income tax purposes as of March 10, 1953, the facts of this case prohibit such recognition. Defendant argues that since this is a suit for refund of taxes paid, plaintiffs have the burden of demonstrating that the Commissioner of Internal Revenue erred in his determination and also they must establish the essential facts from which a correct determination of their tax liability can be made. Roybark v. United States, 104 F.Supp. 759, 762 (S.D.Cal.1952), aff'd. 218 F.2d 164 (C.A. 9th, 1954). Defendant asserts plaintiffs' inability to meet this requirement because no inventory was taken, and there were no new bookkeeping records established as of March 10, 1953, or April 1, 1953, from which an accurate allocation of income can be made as between the Professor and the four new partners. From this premise defendant reasons

that inasmuch as the Professor can not demonstrate the extent of the Commissioner's error, plaintiffs can not ask the Court to correct the error if it exists. I am of the opinion that the difficulty posed is not insurmountable.

Although on date of the assignments there was no assurance that the donees would be accepted into the new partnership, they, nevertheless, were the owners of an interest in the old partnership as of that date subject to any right the New Zealanders might have arising out of the violation by Professor Wilson of paragraph 16 of the agreement which specifically prohibited him from assigning away any of his interests in the company. It should be noted that California Corporations Code Section 15027 provides that a conveyance by a general partner of his interest in the partnership does not of itself dissolve the partnership and that it entitles the assignee to receive the profits to which the assignor might otherwise be entitled. However, without deciding what rights the New Zealanders might have arising out of Professor Wilson's violation of the agreement, I find that he created new ownerships in the partnership which were at least valid until they were set aside *if* the assignments could have been set aside. They were not set aside, however, and in fact were condoned and ratified by the signatures of the New Zealanders to the new partnership agreement. Being owners as of March 10, 1953, the new partners were entitled to company income allocable to their respective percentages of ownership from that date forward. They were also subject to income tax on the income they received allocable to their ownership. Blair v. Commissioner of Internal Revenue, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465 (1937).

I will leave to counsel for plaintiffs and defendant the admittedly difficult task of allocating, within the limits indicated by this opinion, the income for the 1952–53 fiscal year between plaintiffs and the four new partners. If counsel are unable to agree to an allocation, then the court will order the case reopened for the limited purpose of taking further evidence in an effort to establish a record from which equitable allocation can be made by the court as of March 10, 1953.

## ALLOCATION OF WILMARK LOSSES

Although evidence was taken on the issue of whether Wilmark Company losses were allocable to the son, daughters and Trustee for 1953, 1954 and 1955 the post-trial briefs of the parties indicate that plaintiffs have agreed that none of the losses for these years shall be allocable to those persons, hence the court will not discuss the question.

## UNDERESTIMATION PENALTY

██ We come next to the question of whether the plaintiffs can escape the penalty imposed under the provisions of Section 294(d) (2) of the 1939 Code for substantial underestimation of their 1953 tax. The section involved provides that if 80% of the income tax due from an individual other than a farmer (or 66⅔% if a farmer) exceeds the estimated tax paid and tax withheld, a penalty equal to 6% of the excess shall be added to the tax due.

The return filed by plaintiffs for 1953 reflected a tax liability of $25,643.24 against which credits of only $10,200.00 and $1,930.40 were claimed for estimated tax and withholding respectively. A balance of $13,512.84 was paid with the return when it was timely filed. Thus, even before considering the adjustments upward that resulted from the Internal Revenue Service audit, the plaintiffs paid less than 50% of their reported tax liability for 1953. They were assessed and paid a penalty of $1,131.04 for underestimation of their tax. Within proper time they filed a claim for refund of the penalty but set forth no reasons for their claim other than asserting the penalty to be erroneous. In their complaint the plaintiffs again fail to state any reason why the penalty was erroneous, and no evidence was taken during the trial to support the claim for refund other than

evidence directed to the issue of reducing the Professor's 1953 taxes. In their opening post-trial brief, plaintiffs suggest that possibly the Professor was a farmer in 1953 and thus at least had the protection of the 66⅔% provision of the statute. Plaintiffs' suggestion is rejected. The Professor was a professor. Additionally, he had substantial income from the Wilson Company, the Elastrator Company and from other investments. He did have a small farm "rental" operation, but in this he reported a net loss of $254.74 out of a gross rental income of $1,671.64. Merely because a substantial portion of one's income may come from sales and services to farmers does not make one a farmer any more than a merchant, lawyer, or doctor who caters mainly to farmers becomes a farmer by association. Certainly, Professor Wilson's "estimated gross income from farming * * * (was not) at least two-thirds of the total gross income from all sources" as is required by the statute if he is to be given the privilege of the farmers 66⅔% estimate.

The claim for refund of the under-estimation penalty will be denied except to the extent that the amount of the penalty may be adjusted downward by the effect of other conclusions expressed in this opinion.

## SABBATICAL LEAVE EXPENSES

At the outset of this case, plaintiffs sought a refund for taxes they claimed were erroneously collected due to the disallowance of expenses incurred by the Professor while he was on sabbatical leave. Evidence was taken during the trial on the issue. The Court has been advised that the parties have now reached an agreement on this issue, hence it need not be further considered.

This Opinion shall constitute the Court's Findings of Fact and Conclusions of Law. Counsel for the respective parties to this action shall agree upon and submit to the Court a form of Judgment consistent herewith.